# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| v. | : | |
| JIGUVESHKUMAR PATEL, a/k/a "Jay" | : | Mag. No. 07-2003 (JS) |

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  On or about the dates set forth in Attachment A, in Ocean County, in the District of New Jersey and elsewhere, defendant Jiguveshkumar Patel did:

### SEE ATTACHMENT A

in violation of Title 18, United States Code, Section 201.

I further state that I am a Special Agent of the United States State Department Bureau of Diplomatic Security, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached page and made a part hereof.

MICHAEL P. EAGAN
Special Agent
U.S. State Department
Bureau of Diplomatic Security

Sworn to before me and subscribed in my presence,
January 22, 2007, at Camden, New Jersey

HONORABLE JOEL SCHNEIDER
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

# CONTENTS APPROVED

## UNITED STATES ATTORNEY

By:

JASON M. RICHARDSON,  AUSA

Date: January 22, 2007

Attachment A

From on or about September 2006, to on or about January 2007, in the District of New Jersey and elsewhere, defendant

JIGUVESHKUMAR PATEL

directly and indirectly, corruptly offered and promised a thing of value, that is $40,000, to a public official[1] or person who had been selected to be a public official and offered and promised a public official or person who had been selected to be a public official to give a thing of value, that is $40,000, with intent to influence an official act[2] and to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; and induced such public official or such person who has been selected to be a public official to do or omit to do any act in violation of the lawful duty of such official or person.

All in violation of Title 18, United States Code, Sections 201(b)(1)(A), (B) & (C) and 2.

---

[1] The term "public official" means "an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, . . . , in any official function, under or by authority of any such department, agency, or branch of Government." 18 U.S.C. § 201(a)(1).

[2] The term "official act" means "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3)

Attachment B

I, Michael P. Eagan, am a Special Agent (SA) with the United States Department of State, Bureau of Diplomatic Security ("DS"). Following an investigation, I am aware of the following facts, although I have not included all of the facts known to me in this affidavit, just those facts which I believe necessary to establish probable cause. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part:

BACKGROUND

1.       Through conversations with a cooperating individual ("CI1"), I learned that defendant Jiguveshkumar Patel wanted to obtain a United States Visa for the son of his business partner. The son is a native and citizen of India.

2.       I further learned that Jiguveshkumar Patel is a naturalized United States citizen having emigrated from India.

3.       A citizen of a foreign country, wishing to enter the United States, generally must first obtain either a non-immigrant visa for temporary stay, or an immigrant visa for permanent residence. The type of visa required is determined by immigration law and relates to the purpose of the foreign citizen's travel. Non-immigrant visas are for international travelers, (citizens of other countries), coming to the United States temporarily. This visa allows an individual to travel to a United States port-of-entry (an airport, for example) and request permission of the Department of Homeland Security immigration inspector to enter the United States. A visa does not guarantee entry into the United States. International travelers come to the United States for a wide variety of reasons, including tourism, business, medical treatment and certain types of temporary work.

4.       Indian citizens who wish to visit the United States temporarily must first apply for

a visa through the Consular Section of the United States Embassy or Consulate General in India. (The United States Department of State is represented in foreign countries in the form of Embassies and the Consulate Generals). Non-immigrant visa applicants are required to present documentation to the Embassy or Consulate General that is sufficient to demonstrate the applicant's economic and social ties to India. United States law presumes that anyone who applies for a non-immigrant visa intends to remain in the United States permanently. If the applicant is not able to overcome this presumption, the applicant will not be eligible to receive a visa. The burden of proof is on the visa applicant. It is the applicant's responsibility to prove that the applicant can pay for the round-trip and that the applicant has social and economic ties to India that are strong enough to bring him or her back promptly. Documents which demonstrate the applicant's social and economic ties to India, the purpose of the proposed trip, and arrangements to cover the cost of the trip will support eligibility for a visa. The application process can take at least several weeks, if not months.

INVESTIGATION

5.      On or about September 14, 2006, during a discussion between CI1, Jiguveshkumar Patel and others, Patel learned that CI1's daughter worked for "Immigration."[3]

6.      On or about September 15, 2006, a second cooperating individual ("CI2") was in Patel's convenience store, located at 19th Avenue and F Street, Lake Como, New Jersey. During CI2's visit to the store, he/she mentioned to Patel that CI1's daughter worked for Immigration.

7.      On or about September 16, 2006, CI1 went to Patel's convenience store and was approached by Patel. During the conversation, Patel said that CI1's daughter worked in India for

_____

[3] Immigration and Customs Enforcement is a component of the United States Department of Homeland Security.

United States Immigration agency. Patel then asked CI1 if his daughter was still in India. CI1 told Patel that CI1's daughter was living in Virginia. Patel then told CI1, in substance and in part, that his business partner's son was in India and his partner wanted to get his son out of India and into the United States. Patel went onto say that his partner's son was not able to obtain a visa to the United States. Patel told CI1 that his partner would pay CI1 $10,000 and an additional $10,000 to CI1's daughter if CI1's daughter could get Patel's partner's son out of India and into the United States.

8.      On or about September 25, 2006, CI1 returned to Patel's store. Patel approached CI1 and gave him/her a sealed white envelope which Patel said contained copies of his partner's son's passport, birth certificate, and visa size photographs. Patel asked CI1 to give it or send it to his/her daughter.

9.      Over the next several days, Patel repeatedly asked CI1 if his daughter was making any progress in her efforts to help Patel's partner's son gain entry into the United States

10.     On or about November 8, 2006, I met with CI1 and gave CI1 an email address and asked that CI1 provide it to Patel so that, acting in an undercover ("UC") capacity, I could pose as CI1's daughter and communicate with Patel regarding his request for a visa for his partner's son.

11.     On or about November 14, 2006, I received an email from Patel which stated "I spoke with [CI1] regarding India and he told me that you might be able to help me with this situation. I am not sure what the next step is, so can you please let me know what i[sic] have to do to continue this process." On November 15, 2006, I responded to the email and asked Patel where his partner's son was located so I could facilitate his visa process, and how much he was

- 3 -

willing to pay because CI1 initially told me between $30,000 and $40,000.

12.     On or about November 16, 2006, Patel sent an email which stated that his partner's son was in Gujarat, Ahmedadad and that he was interested in a "multiple visa." Posing as CI1's daughter, I responded by telling Patel that I would get a multiple entry visa which would be good for 10 years. (A multiple entry visa allows the holder of the visa to depart and re-enter the United States on multiple occasions without having to apply for a new visa each time he wanted to enter the United States).

13.     On or about November 18, 2006, Patel sent an email which asked what documentation would be needed, how long the process would take and whether the visa could be obtained in India. Acting in an undercover capacity, I responded that the process should take two to three weeks and I needed his partner's son's passport. I also told Patel that I needed half of the money "up front" and the rest on delivery of the passport with the visa affixed to it.

14.     On or about November 19, 2006, Patel sent an email inquiring as to the address to send his partner's son's passport. On December 1, 2006, I instructed Patel to send the passport to an address in Arlington, Virginia. In response, on or about December 1, 2006, Patel sent an email asking, "how would you like me to send the money?" On or about December 3, 2006, I responded to Patel and stated, "Please realize that me and my husband are taking a large risk for you and your son. I am assuming that you have half of the total balance $20,000 right now. I would like the money in cash. I don't trust the U.S. Post Office for delivery of the case and will make arrangements with you for delivery of the money." I also asked if his partner's son was ever in trouble with the police or government officials in India.

15.     On or about December 3, 2006, Patel sent an email which stated that his partner's

son had never been in trouble in India and that half of the total balance in cash was ready. Patel also said that the passport was currently in India but that his partner's son was going to forward it to him. Once Patel received the passport from India, he would forward it to Virginia.

16.     On or about December 16, 2006, Patel sent an email and stated that he had received the passport and would forward it to the address I provided. Patel also asked whether his partner's son would have to be fingerprinted at the airport on arrival in the United States, or would that be taken care of along with the visa, because Patel's "nephew came to America this past summer and he told me that the US consulat [sic] took his fingerprints before they issued his visa. Then when he arrived to [sic] the US they also verified his fingerprints when he went through the immigration at the airport."

17.     On or about December 19, 2006, Patel sent an email stating that he sent the passport. I responded on December 20, 2006 and told Patel that I had received the passport and would start the process of getting a visa for it.

18.     On or about December 20, 2006, a Republic of India passport, issued in the name of Amitkumar Bharatbhai Patel, date of birth 4/11/1987, was received at the address provided to Patel.

19.     On or about December 21, 2006, acting in an undercover capacity, I sent Patel an email and told him that "I dropped the passport off at the visa office . . . and I am awaiting for a call when I can pick it up."

20.     On or about January 16, 2007, I sent Patel an email and arranged for Patel to meet an undercover Special Agent ("UC2") who would be posing as my (UC1's) daughter.

21.     On or about January 17, 2007, at approximately 2:50 p.m., UC2, posing as my

daughter, met with Patel at the Wahl Township rest stop on the Garden State Parkway. Patel arrived at the rest area driving a Toyota Corolla with an unknown male in the passenger seat. Upon seeing UC2's car, Patel parked next to it and walked over to UC2 who was sitting in the passenger seat. UC2 identified herself and asked if Patel was "Jay," to which he responded, "Yes." Patel then handed UC2 a bank envelope. UC2 asked if it was "everything," and Patel responded, "half of it." The UC2 told Patel that she would count it and that her "mom would email him." The envelope contained approximately $10,000 in $100 dollar bills.

22.     On or about January 17, 2007, I emailed Patel and complained that he only provided $10,000 and not the $20,000 that he had promised. I also sent him a copy of the visa as a sign of good faith.

23.     On or about January 18, 2007, Patel sent an email that stated "I apologize for the amount you recieved [sic] yesterday but I thought the total amount was 20k, so that is the reason why I gave your daughter only 10k. I have no problem paying the 40k, so I am assuring you that you will get the full 30k upon delivery of the documents! The only problem is I will need 1 more week to get that together. I would also like to meet at a different place at time of delivery because that place we met at yesterday has video surveillance. Finally, the picture of the document was not attached to the e-mail you last sent. Once again please accept my apology, I want to trust that I am willing to comply with your request's!"